UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JESSE L. WALKER,

                             Plaintiff,

            -v-

METRO NORTH COMMUTER RAILROAD,

                            Defendant.

23-CV-9883 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Plaintiff Jesse L. Walker, Jr., proceeding *pro se*, brings this action against Defendant Metro-North Commuter Railroad ("Metro-North"). Walker, a current employee, contends that Metro-North violated Title VII by refusing to promote him, consistently assigning him less desirable projects, pursuing made-up disciplinary charges against him, and creating a hostile environment. Before the Court is Metro-North's motion to dismiss for failure to state a claim. For the reasons that follow, the motion is denied.

**I.  Background**

    **A.  Factual Background**

The following facts are drawn from Walker's first amended complaint (ECF No. 4 ("FAC")), and opposition to Metro-North's motion to dismiss (ECF No. 9 ("Opp.")),[1] and are assumed to be true for the purposes of resolving this motion. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 76 (2d Cir. 2015).

---

[1] "A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013). Because Walker is proceeding *pro se*, the Court will consider facts raised in his opposition to the motion to dismiss and attached exhibits.

Walker has worked for Metro-North for the past nineteen years. (Opp. at 2.)[2] Before joining Metro-North, he was a service member in the United States Air Force, where he specialized in "Cryptographic Secure Communications." (*Id.*) He also has technical training from the New Jersey Institute of Technology, where he has taken over 90 credits, and "Newark College of Engineering's Electrical Engineering Curriculum." (*Id.*)

Since April 2017, Walker alleges that he has "essentially been taken out of the day to day more technical jobs" and is instead consistently assigned to a less desirable project the team members refer to as "troubles." (*Id.* at 4.) "Troubles" are calls that involve "personnel phone issues, radio problems, computer wiring issues," and other less technical assignments. (*Id.*) Walker's manager, Ray Peters, has acknowledged that being on troubles is "a less than desirable job." (*Id.*) To discipline employees, Peters would assign them to troubles. (*See id.*) Further, Walker alleges, Peters would "continuously and without fail" assign Walker and other Black employees to troubles, while new employees of other races were given more technical and desirable projects. (FAC at 8; Opp. At 4; *see also* FAC at 5.)

Walker often felt targeted by Peters. (*See* FAC at 5.) When Walker was assigned to troubles and identified a problem, Peters would "have [Walker] stop working on it and wait until someone else was available to work on it." (Opp. at 4.) On one occasion, even though Walker had followed the usual troubles protocol of waiting for an official report to begin work on a new project, Peters "became belligerent" with Walker and told him: "I told you there was a fucking trouble at 8:30AM." (*Id.* at 5.) After Walker explained to Peters that he was following protocol, Peters "continued and repeatedly returned to [Walker's] desk to chastise [him]." (*Id.*) On

---

[2] For ease of reference, the Court refers to the page numbers automatically generated by ECF at the top of each filing.

another occasion, in the wake of the killing of George Floyd, Walker used the television in the conference room to watch the news. (*Id.* at 4.) Peters then, "without explanation," forbade employees from turning on the television during the workday. (*Id.*) Walker alleges that Peters shut down the television privileges because Walker was the one watching. (*Id.*)

After the outbreak of the COVID-19 pandemic, Walker experienced issues with Peters, John Carr (Walker's direct supervisor), and others in the office refusing to wear masks. (*Id.* at 4, 7.) Walker alleges that these coworkers "all have that Proud Boy mentality." (*Id.* at 7.) In November 2020, Walker, frustrated by Peters and those who refused to wear masks in the office, wrote "MASKS" on the office dry erase board to remind everyone to wear protection. (*See id.* at 4-5.) In response, Peters walked into the communal office space where Walker was working "to unleash a barrage of unfounded complaints in an attempt to belittle [Walker] in the presence on the other shop members." (*Id.* at 5.) During this incident, Peters yelled "I'm tired of this fucking shit!" in front of everyone in the shop. (*Id.* (capitalization altered).) Walker remembers Peters yelling at him "like a drill sergeant" (*id.* at 5) and "coming at [him] like a rabid animal" (*id.* at 7). During this altercation, Peters was standing "one foot away from [Walker's] face with no mask." (*Id.*) Walker reported this incident to the Deputy Director of Diversity and EEO on November 30, 2020. (*Id.* at 7-8.)

After Walker reported Peters for another infraction, Peters retaliated against Walker for notifying higher-ups. (*Id.* at 5.) Walker alleges that when he would file a complaint against Peters, "[Peters] would pull all the shop[']s personnel into the conference room" to announce what had happened "so the entire shop would look down upon [Walker] in a certain fashion." (*Id.*)

In 2021, the Communications Supervisor of the Grand Central Terminal position became

3

available.  (FAC at 5.)  According to Walker, "Ray Peters and others . . . started a campaign to disqualify" him from being considered for this promotion.  (*Id.* (cleaned up).)  This included Peters twice filing "fraudulent disciplinary charges" to ensure Walker would not be considered for the position.  (*Id.*)  Both times, Walker was "found guilty within the internal . . . Metro-North judicial system" (*id.*), and, due to these proceedings, was suspended without pay (*see id.* at 15).  Ultimately, Walker was not promoted to Communications Supervisor, and his career was "derail[ed]."  (*See id.* at 5, 15.)

Walker states that: "Ray Peters . . . hates me for my race, my knowledge, and my intelligence."  (ECF No. 9-2 at 2 (cleaned up).)

### B.     Procedural History

Walker commenced this action on November 8, 2023 (ECF No. 1), and he amended his complaint on November 15, 2023 (FAC).  Metro-North filed a motion to dismiss the amended complaint for failure to state a claim on December 19, 2023.  (ECF No. 6.)  Walker filed an opposition to Metro-North's motion on January 15, 2024 (ECF No. 9), and Metro-North replied in support of its motion on January 29, 2024 (ECF No. 10).

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Such a claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In ruling on a motion to dismiss, the Court must accept as true all factual allegations in the amended complaint, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Ultimately, "[t]he plausibility standard is not akin to a probability requirement." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). At this stage, "the question is not whether a plaintiff is *likely* to prevail, but whether the well-pleaded factual allegations *plausibly* give rise to an inference of unlawful discrimination, *i.e.*, whether plaintiffs allege enough to 'nudge their claims across the line from conceivable to plausible.'" *Vega*, 801 F.3d at 87 (quoting *Twombly*, 550 U.S. at 570) (cleaned up).

Walker is litigating his case *pro se*. "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020). As such, "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks omitted). All of this being true, "a *pro se* complaint must state a plausible claim for relief." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

**III.   Discussion**

Metro-North has moved to dismiss Walker's complaint, contending that Walker has failed to adequately allege disparate treatment, retaliation, or a hostile work environment under Title VII. Further, Metro-North argues it cannot be subject to punitive damages as a public benefit corporation, and that the Court should exercise its discretion in issuing a stay pending arbitration of Walker's disciplinary actions by the National Railroad Adjustment Board.[3]

---

[3] Metro-North also moves to dismiss pursuant to Rule 8 because "[Walker's] vague and conclusory allegation does not provide Metro-North adequate notice of his claims and the opportunity to defend itself." (ECF No. 7 at 20.) While Walker included some vague phrases about "fraudulent frame ups and systematic oppression" in his complaint (FAC at 8), his Opposition to Metro-North's Motion to Dismiss adequately alleges facts sufficiently targeted to disparate treatment, retaliation, and hostile work environment claims under Title VII to provide Metro-North with fair notice. *See Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) (holding

A.     **Disparate Treatment**

Metro-North first moves to dismiss Walker's Title VII discrimination claim, arguing that Walker has failed to plead facts that would raise an inference of racial discrimination by Metro-North. (ECF No. 7 ("Mem.") at 7-8.) Title VII, in relevant part, reads:

> It shall be an unlawful employer practice for an employer—
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

Courts use the three-step *McDonnell Douglas* burden-shifting framework to analyze Title VII disparate treatment claims. *See Bart v. Golub Corp.*, 96 F.4th 566, 569-70 (2d Cir. 2024). "A plaintiff's first step under *McDonnell Douglas* is to establish a prima facie case of discrimination by showing that '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Id.* (quoting *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 (2d Cir. 2023)).

At the motion to dismiss stage, plaintiffs must only pass the first step, and "the prima facie requirements are relaxed." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). Specifically, "[t]he facts required by *Iqbal* to be alleged in the complaint need not give

---

that a plaintiff who identified "particular events giving rise" to her claims and who alleged that "she was treated less favorably . . . because of her race" gave defendant adequate notice under Rule 8 for federal civil rights claims).

plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination," bur rather "need only give plausible support to a minimal inference of discriminatory motivation." *Id.* at 311; *see also Mandala v. NTT Data, Inc.*, 975 F.3d 202, 208 (2d Cir. 2020) ("Over a series of opinions, we clarified that *Iqbal* does not require a plaintiff to plead a prima facie case. Instead, it simply requires a plaintiff to assert enough nonconclusory factual matter to nudge her claim across the line from conceivable to plausible to proceed.'" (cleaned up)).

### 1. Protected Class

Metro-North does not contest that Walker adequately alleges the first prong of the prima facie case of discrimination, that Walker, who is Black, is a member of a class protected under Title VII. *See* 42 U.S.C. § 2000e–2(a) (enumerating "race" as a protected category).

### 2. Qualification For Positions

Because Walker is alleging disparate treatment hindering his current position and prohibiting him from a promotion, he must "show[] that he was qualified" for his current job and the Supervisor position he seeks. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). There is no question that Walker is qualified for his current position. *See Carter v. Cornell Univ.*, 976 F. Supp. 224, 231 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1345 (2d Cir. 1998). Walker has worked for Metro-North for the past nineteen years (Opp. at 2) and has worked in the "Kitt Room" where he works now throughout that entire time (ECF No. 9-2 at 4). Further, Metro-North does not contest that Walker is qualified for his current job.

Walker also adequately alleges that he is qualified for the Supervisor position. Metro-North states that "Walker was deemed ineligible for consideration [of the Supervisor position] based on his recent discipline." (Mem. at 10.) However, Walker is also alleging that this discipline itself was disparate treatment prohibited by Title VII. (*See* FAC at 5). If Walker is

successful in convincing a jury that the disciplinary charges were racially motivated and thus violated Title VII, Metro-North's reasoning for Walker's disqualification would no longer be valid. *See Terry*, 336 F.3d at 138-39 (holding that an employee who was allegedly left off a promotion list that management relied upon because of his race was still "qualified" for the promotion for the purposes of a *McDonnell Douglas* analysis).

Walker has been a Metro-North employee for nearly two decades. (*See* Opp. at 2.) Previously, he was a service member in the United States Air Force where he specialized in "Cryptographic Secure Communications." (*Id.*) He also has technical training from the New Jersey Institute of Technology and "Newark College of Engineering's Electrical Engineering Curriculum." (*Id.*) While the exact qualifications of the Supervisor position are not stated, Metro-North notably did not contend that Walker was otherwise unqualified for the job beyond the disciplinary charges at issue in this case. (*See* Mem. at 10.) Thus, Walker has adequately alleged his qualifications to survive the initial step in the *McDonnell Douglas* framework.

### 3. Adverse Employment Actions

Next, Walker must identify adverse employment actions he experienced during his time at Metro-North. *Bart*, 96 F.4th at 569-70. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (internal quotation marks omitted). "Examples of materially adverse changes include . . . a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Joseph*, 465 F.3d at 90 (*quoting Terry*, 336 F.3d at 138).

First, Walker alleges that he was denied the promotion to the Communications Supervisor of the Grand Central Terminal. (FAC at 5.) The Second Circuit has made it clear

that "failure to promote" qualifies as an adverse employment action under Title VII. *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 269 (2d Cir. 2023) (collecting cases).

Second, Walker alleges that his boss filed false disciplinary charges against him. (FAC at 5.) A mere reprimand or threat of disciplinary proceedings without subsequent consequences is not a materially adverse employment action. *See Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir.). Here, however, there was ensuing punishment. Walker alleges that he was found "guilty" in the disciplinary actions against him. (FAC at 5.) He further states, in his claim for relief, that he has experienced "wages lost to suspension" due to "the false charges [on his] employee record." (FAC at 15.) Metro-North does not contest that Walker was suspended as a result of these disciplinary proceedings. (*See* Mem. at 9-11 ("Walker was informed that he had been found guilty of his charges and would receive a 15-day actual and 15-day deferred suspension . . . .").) Thus, because Walker has alleged material adversity stemming from the disciplinary charges, they qualify as adverse employment actions for Title VII purposes.

Third, Walker alleges that he was consistently assigned to "troubles" rather than permitted to work on technical assignments in the shop. (ECF No. 9-2 at 4.) To qualify as an adverse employment action under Title VII, an action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry*, 336 F.3d at 138 (internal quotation marks omitted). However, "significantly diminished material responsibilities" can qualify as an adverse action. *See id.* Walker alleges that he has "essentially [been] taken out of the day to day more technical jobs, issues and monitoring the system. While others have been trained on test equipment and maintenance procedures [Walker has] been only assigned to troubles unless there is no other option." (ECF No. 9-2 at 4.) Walker is alleging more than just "a mere inconvenience or an alteration of job responsibilities." *See Terry*, 336 F.3d at 138. Being

9

consistently assigned to troubles, a job usually given as punishment to other employees (Opp. at 4), and missing out on opportunities to train and grow as a technically skilled employee has "derail[ed] [his] career" and "[halted] [his] educational path within the company" (*see* FAC at 15). Because Walker adequately alleges that the troubles assignments had a materially adverse impact on his career, this collectively qualifies as an adverse employment action.

### 4. Inference of Racial Discrimination

The final prong of the *McDonnell Douglas* prima facie case is whether Walker adequately alleges an inference of racial discrimination in Metro-North's actions. *Bart*, 96 F.4th at 569-70. The Second Circuit "ha[s] characterized the evidence necessary to satisfy this initial burden [of adequately alleging an inference of racial discrimination] as 'minimal' and '*de minimis*.'" *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 380-81 (2d Cir. 2001) (collecting cases). And the United States Supreme Court has stated that this burden "is not onerous" on plaintiffs. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). Even without actions by an employer that "directly indicate[] racial bias," a sufficient "inference of discrimination can arise from circumstances including . . . the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." *Littlejohn*, 795 F.3d at 312-13.

Walker surpasses the low threshold required of plaintiffs at this stage. Walker states that his boss, Ray Peters, would "continuously and without fail" assign Walker and other Black employees to less desirable projects while non-Black employees were given more technical and in-demand jobs. (*See* Opp. at 4; FAC at 5, 8.) Further, Walker states that his boss "hates [Walker] for [his] race" (ECF No. 9-2 at 2), and "levied false charges against [Walker] multiple times to ensure [he] would not be promoted" (FAC at 5). Walker has also stated that Peters and

10

his direct supervisor, John Carr "have that Proud Boy mentality."[4]  (ECF No. 9-1 at 1.)  These allegations point to a reasonable inference that racial discrimination motivated the adverse employment actions taken against Walker.

Given the special solicitude afforded to *pro se* litigants and the low burden for Title VII plaintiffs at this stage in litigation, Walker has met the "*minimal* burden of showing facts" that he was a member of a protected class; was qualified for his position and the Supervisor position; and experienced adverse employment actions by Metro-North's refusal to promote him, its consistent assignment of Walker to lower quality projects, and its disciplinary actions against him.  *See Littlejohn*, 795 F.3d at 311.  Further, Walker adequately alleges facts showing an "inference of discrimination" that motivated these actions.  *See id.* at 312.  Metro-North's motion to dismiss Walker's disparate treatment claim is thus denied.

**B.     Retaliation**

Metro-North next moves to dismiss Walker's Title VII retaliation claim, arguing that Walker did not participate in a protected activity and that he failed to draw a causal connection between any alleged protected activity and an adverse employment action.  (Mem. at 16.)

---

[4] The Court may "take judicial notice of relevant matters of public record."  *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012).  The Court takes such notice of public allegations that some members of the Proud Boys, "a right-wing extremist group," harbor animosity against Black people.  *See, e.g.*, Josh Campbell, *Proud Boys members ordered to pay over $1 million in 'hateful and overtly racist' church destruction civil suit*, CNN (July 1, 2023), https://www.cnn.com/2023/07/01/politics/proud-boys-fined-ame-church-destruction/index.html (reporting DC Superior Judge Neal Kravitz's default judgment in a civil suit about the destruction of property at a Black church in Washington, DC, writing that the group has "incited and committed acts of violence against members of Black and African American communities across the country").  The Court does not take notice of these allegations "for the truth of the facts asserted," but rather "to establish the existence of the opinion" that a person could reasonably think having a "Proud Boy mentality" would include racial discrimination against a Black man.  *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Title VII retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. *Hicks v. Baines*, 593 F.3d 159, 164 (2d. Cir. 2010). To survive a motion to dismiss a claim of retaliation under Title VII, "a plaintiff must show (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Bucalo*, 691 F.3d at 129 (internal quotation marks omitted). "The term 'protected activity' refers to action taken to protest or oppose" activity prohibited under Title VII, *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), and includes "informal" complaints, *Littlejohn*, 795 F.3d at 317. "To establish that [a plaintiff] engaged in protected activity, [he] need not establish that the conduct [he] opposed was actually a violation of Title VII, but only that [he] possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013) (internal quotation marks omitted).

Walker alleges multiple instances where he "opposed" activity by his boss that he believed was a violation of his civil rights. In November of 2020, Walker reported his manager, Peters, for "exhibit[ing] negative bias against [Walker]" to Metro-North's Deputy Directory of Diversity and Equal Employment Opportunity ("EEO"). (ECF No. 9-1 at 1.) Walker wrote to the Deputy: "He thinks he has the right to speak to me in any tone he want[s][;] an overseeing mentality. I assure you he does not have that right." (*Id.*) On another occasion, Walker complained to Peters's boss about his conduct via email. (ECF No. 9-2 at 5.) These complaints, though informal, qualify as opposing activity protected by Title VII. *Littlejohn*, 795 F.3d at 317.

Further, Walker adequately alleges a causal connection between these complaints and the adverse employment actions he experienced. Whenever Walker would complain to Peters's

supervisor, "[Peters] would pull all the [shop's] personnel into the conference room explaining what was going on so the entire shop would look down upon [Walker] . . . ." (*Id.* at 5.)  On one occasion, Peters was copied on a chain of emails between Walker and a higher-up regarding Peters's conduct.  (*Id.*)  Peters printed out the email chain, "tacked it on the [shop's] dry erase[] board," drew "one foot large arrows" around it, and wrote: "PLEASE READ, RAY."  (*Id.*)  Throughout this time and afterwards, Walker was consistently relegated to less desirable projects (*Id.* at 4), and he ultimately was denied a promotion for which he was qualified (FAC at 5).

Walker has a low bar to clear at the pleading stage of a Title VII complaint, and he has met this minimal burden by making informal complaints about Peters's allegedly racially motivated behavior and continuing to experience less desirable work assignments from Peters after these complaints became known to Peters.  Second, because Walker is alleging that Peters intentionally filed disciplinary charges against Walker to prevent his promotion, and the plaintiff's allegations must be assumed to be true at this stage, it is plausible that Peters's actions were in retaliation for the prior complaints Walker had filed.

Metro-North's motion to dismiss Walker's retaliation claim is thus denied.

### C. Hostile Work Environment

Metro-North next moves to dismiss Walker's Title VII claim of a hostile work environment, arguing that Walker has failed to allege "severe or pervasive" harassment and, in the alternative, that Walker failed to administratively exhaust this claim because he did not raise it in his complaint with the New York State Division of Human Rights ("NYSDHR").

To survive a motion to dismiss a claim for hostile work environment, a plaintiff must show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d

365, 373 (2d Cir. 2002) (cleaned up).  To show that harassment rises to the level of "severe or pervasive," a plaintiff "must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."  *Id.*  Further, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class."  *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

Walker describes an uncomfortable work environment at Metro-North.  His boss openly mocked him on one occasion for making complaints to higher-ups (Opp. at 5), once yelled and cursed at Walker in front of his colleagues (*id.* at 4-5), and twice filed allegedly false disciplinary charges against Walker to prevent a possible promotion (FAC at 5).  These one-off actions alone likely do not rise to the level of "severe or pervasive."  *See Banks v. General Motors, LLC*, 81 F.4th 242, 262 (2d Cir.) ("A plaintiff must show that . . . a single incident was extraordinarily severe." (internal quotation marks omitted)); *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) ("As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." (internal quotation marks omitted)).

However, Walker's allegations about Peters's and Carr's refusal to wear masks during the height of a deadly pandemic plausibly constitute severe or pervasive harassment.  The mask refusal was not a one-time event; Walker states that he had to "consistently remind Ray Peters and other[s] that they need to wear a mask." (Opp. at 4.)  And when Walker then attempted to use the conference room to socially distance himself, Peters mandated "out of the blue" that no one was allowed to use the conference room anymore.  (*Id.*)  While refusing to wear a mask in 2024, given the availability of vaccinations and herd immunity, would likely not rise to the level of "severe or pervasive" harassment, such conduct in 2020, when a reasonable person could have

14

felt that unmasking in a confined workplace was a daily threat to one's life, could plausibly rise to this level.[5]

Further, Walker sufficiently connected this harassment to his race. He reported the mask incidents to Metro-North's Deputy Director of Diversity and EEO as an example of Peters's "negative bias against [Walker]" and because of Peters's and others' "Proud Boy mentality."[6] These phrases, read in connection with Walker's allegations against Peters for harboring racial bias against him in job assignments and sabotaging Walker's promotion attempts, adequately connect the refusal of Peters to wear a mask around Walker to his race.[7]

Finally, Metro-North's alternative defense that Walker failed to administratively exhaust this claim is incorrect. Though Walker did not check the box on his NYSDHR complaint that he had been "harassed or intimidated" (Mem. at 12), he did allege other employment discrimination claims that were sufficiently related to a hostile work environment such that the exhaustion requirement is satisfied. *See Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610, 614 (2d

---

[5] As a court in this District noted in August 2020: "The Court may take judicial notice of 'relevant matters of public record.' *See Giraldo v. Kessler*, 694 F.3d 161, 16[4] (2d Cir. 2012). According to the Centers for Disease Control and Prevention, COVID-19 is a highly infectious and potentially deadly respiratory disease caused by a newly discovered coronavirus that spreads easily from person-to-person. There is no pre-existing immunity against this new virus, which has spread worldwide in an exceptionally short period of time, posing a serious public health risk. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic." *Geller v. Cuomo*, 476 F. Supp. 3d 1, 4 (S.D.N.Y. 2020) (internal quotation marks omitted).

[6] *See supra* note 4 and accompanying text.

[7] Though the Court is making some logical connections between Walker's various allegations, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest*" at this stage in litigation. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis in original).

Cir. 1999) ("[C]laims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency.")

Metro-North's motion to dismiss Walker's claim of a hostile work environment under Title VII is therefore denied.

### D.  Punitive Damages

Metro-North next argues that, "[s]hould any of Walker's claims remain, his request for punitive damages should nevertheless be dismissed with prejudice." (Mem. at 20.) To support its argument, Metro-North cites a series of cases holding that "public benefit corporations" are generally exempt from punitive damages because of their close connection to the government. (*See id.* at 20-21.)

The Second Circuit has determined that "government entities are exempted from the punitive damages provision of Title VII." *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 256 (2d Cir. 2005). And the New York Court of Appeals has held that "public benefit corporations," defined as entities largely funded by public sources and serving an "essential public function," are not generally subject to punitive damages for the same policy reasons government entities are not. *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 386-88 (N.Y. 1987). After all, "punishment and deterrence . . . are hardly advanced when applied to a governmental unit since it is the taxpayers who are ultimately penalized." *Hargett v. Metro. Transit Auth.*, 552 F. Supp. 2d 393, 404 (S.D.N.Y. 2008) (*Sharapata v. Town of Islip*, 56 N.Y.2d 332, 338 (N.Y. 1982); *see also Tanvir v. LaPorte*, No. 93-CV-6923, 1997 WL 473084, at *4 (S.D.N.Y. June 13, 1997) ("Affording immunity from punitive damages awards to public benefit corporations under Title VII . . . protects taxpayers from being punished for wrongful conduct they played no part in, and safeguards tax money earmarked to be spent to advance the public good.").

However, whether or not an entity qualifies as a "public benefit corporation" is a factual determination that should be resolved at a later stage in litigation. Though Metro-North cites cases identifying its affiliates as public benefit corporations, none of these cases determine that Metro-North itself is a public benefit corporation. (*See* Mem. at 20-21.) And neither the Second Circuit nor the New York Court of Appeals has held that Metro-North is a public benefit corporation in the context of avoiding punitive damages under Title VII.

Further, "the question of whether to award punitive damages is an intensely factual [one], and is ill suited for dismissal" at this stage in litigation. *Henkels & McCoy Grp., Inc. v. Verizon Sourcing, LLC*, No. 21-CV-9576, 2022 WL 1185817, at *5 (S.D.N.Y. Apr. 21, 2022) (internal quotation marks omitted).

Because the determination of Metro-North as a public benefit corporation and the applicability of punitive damages are fact-intensive inquiries better resolved at a later stage in litigation, Metro-North's motion to dismiss is denied.

### E.  Stay Pending Arbitration

Finally, Metro-North moves to stay Walker's remaining claims "pending the outcome of his request for arbitration to the National Railroad Adjustment Board." (Mem. at 21.) To support its argument, Metro-North cites Second Circuit precedent: "The decision to stay the balance of the pending arbitration is a matter largely within the district court's discretion to control its docket." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856 (2d. Cir 1987); (Mem. at 15). The next sentence in *Genesco* is also relevant here: "Broad stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco*, 815 F.2d at 856.

The pending arbitration to which Metro-North refers concerns Walker's disciplinary suspensions for allegedly "engaging in conduct unbecoming [of] a Metro-North employee,

assuming the attitude of sleep/sleeping on duty[,] and violating Metro-North safety rules." (Mem. at 10-11.)  Metro-North has not stated that Walker's allegations of racial discrimination, retaliation, or a hostile work environment would be adjudicated during this arbitration.

Because the "arbitrable claims" of Walker's disciplinary infractions do not "predominate" the current lawsuit, and Walker's nonarbitrable Title VII claims are meritorious enough to survive this motion to dismiss, the Court declines to use its discretion to issue a stay. *See Genesco*, 815 F.2d at 856.  However, given that the arbitration may impact future stages of litigation, the parties are directed to update the Court on the arbitration's outcome as soon as it is finalized.

**IV.   Conclusion**

For the foregoing reasons, Metro-North's motion to dismiss the complaint is DENIED and its motion to stay is DENIED.  Metro-North shall file an answer within fourteen days after the date of this opinion and order.  *See* Fed. R. Civ. P. 12(a)(4)(A).

The Clerk of Court is directed to close the motion at Docket Number 6.

SO ORDERED.

Dated: September 23, 2024
       New York, New York

_____
J. PAUL OETKEN
United States District Judge